UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

DAVID F. CARTER, III,

    Plaintiff,

v.

STATE OF MARYLAND,
DEPARTMENT OF CORRECTIONS,
WARDEN CARLOS BIVENS and
DR. JERRY ANN HUNTER,

    Defendants.

Civil Action No. TDC-23-1070

## MEMORANDUM OPINION

David F. Carter, III, a state inmate incarcerated at the Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland, has filed this civil action pursuant to 42 U.S.C. § 1983 in which he alleges that he has been denied adequate medical care in violation of his rights under the Eighth Amendment to the United States Constitution. Pending before this Court are separate Motions to Dismiss or, in the Alternative, Motions for Summary Judgment filed by Defendant Dr. Jerry Ann Hunter and by Defendants the State of Maryland, Department of Corrections, and RCI Warden Carlos Bivens (collectively, "the State Defendants"). Both Motions are fully briefed. Having reviewed the submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, both Motions will be GRANTED.

## BACKGROUND

### I. The Amended Complaint

At all times from February 2019 to the present, Plaintiff David F. Carter, III was incarcerated at either RCI or Maryland Correctional Institution – Hagerstown ("MCIH"), which

are both located on the same compound in Hagerstown, Maryland. Carter alleges that during this time period, his complaints regarding chronic pain were not adequately addressed by medical staff at RCI and MCIH.

According to Carter, in 2004, he was run over by a minivan in Cecil County, Maryland, which required his placement in a shock trauma unit in a Delaware hospital. Treatment for his injuries included the surgical implantation of two plates with nine screws in his wrist and forearm, as well as two screws in his ankle. Carter asserts that in the years since, he had effective medication, both narcotic and non-narcotic, to address chronic pain resulting from the accident, but the pain medication provided at RCI and MCIH has been ineffective. He states that he was given Tegretol, which he describes as a "psych med," that did not "nothing" to address his pain. Am. Compl. at 4-5, ECF No. 8. On two occasions, Carter was prescribed Neurontin, also known as gabapentin, which was effective, but he was then taken off of that medication. He was also prescribed Baclofen, which is a muscle relaxer, but he was later taken off of that medication by a pain management committee. The pain management committee then prescribed Cymbalta, which Carter describes as a medication for depression. Carter recalls that he had been prescribed Cymbalta in March 2010 following the death of his sister, but it caused him to suffer side effects such as migraines, blurred vision, and nausea. When he received Cymbalta at RCI, he had the same side effects as before.

According to Carter, he has vigorously complained about his chronic pain through sick call requests and administrative remedy procedure complaints ("ARPs"), but it has not been adequately addressed. He asserts that he has pain on a daily basis and that there are days that he has "shocking pain up the bottom side of my wrist to my elbow." Id. at 6-7. Despite this pain, he acknowledges that he lifts weights regularly, even as the doctors have advised him not to do so, because he

2

believes that such advice is unhealthy given that he is generally locked in his cell for 20 hours per day.

Beyond the issue of pain management, Carter asserts that he asked for x-rays on his wrist and ankle from February 2019 forward but did not receive such x-rays until May 2023 and, even then, was not told of the results. He also states that although he has requested an ankle sleeve or brace and a wrist brace every six months, he has not received these items.

As relief, Carter seeks "proper medications" and $100,000 in damages. *Id.* at 5.

## II. First Treatment at RCI

According to Carter's medical records, on January 4, 2019, he was seen at RCI by Dr. Maksed Choudry for chronic pain and other conditions not at issue in this case. At that time, Carter informed Dr. Choudry that he had aching pain associated with his wrist and ankle injuries that worsened with activities and for which he had been taking Oxycodone and Neurontin prior to his incarceration. Carter told Dr. Choudry that he thought that Naproxen, a nonsteroidal anti-inflammatory drug ("NSAID"), helped with his pain. Carter asked Dr. Choudry about Tramadol, but Dr. Choudry told him that it is a Class IV narcotic that is not recommended for chronic use. Dr. Choudry then prescribed Naproxen as well as another pain medication, Elavil.

## III. Treatment at MCIH

On January 24, 2019, Carter was transferred to MCIH. On February 27, 2019, when Carter was seen by Nurse Practitioner Lum Maximuangu for chronic care, he reported that Naproxen did not relieve his pain and that he was unable to tolerate Elavil. Carter requested a prescription for Baclofen, but Maximuangu informed him that it could not be used for chronic pain management. Instead, Maximuangu recommend that he receive Indomethacin, which is an NSAID, as well as Tegretol, also known as carbamazepine.

On March 27, 2019, Dr. Jonathan Thompson saw Carter for chronic care relating to other issues. Carter did not report any new complaints or concerns regarding his pain. Carter received prescriptions for Tegretol and Indomethacin and generally continued to receive these two medications through July 2, 2021. During this time period, he had chronic care or other medical visits with nurses or physicians at which his pain medication was considered and renewed as necessary on June 12, 2019; September 5, 2019; December 15, 2019; January 17, 2020; June 27, 2020; August 27, 2020; January 27, 2021; March 16, 2021; April 14, 2021; and May 5, 2021.

Dr. Hunter conducted the visits on January 17, 2020, April 14, 2021, and May 5, 2021. During the April 2021 visit, Dr. Hunter added Baclofen to the medications Carter was receiving, which she increased from 10 mg to 20 mg on May 5, 2021.

On August 9, 2021, after Carter's Tegretol prescription had expired, he was seen by Dr. Abduzahed Jahed for chronic care. Dr. Jahed continued Carter's prescriptions for Indomethacin and Baclofen and also submitted a request for 300 mg of Neurontin for usage twice a day. The request for Neurontin was not approved by the Medical Director, Dr. Dereje Tesfaye. Carter's Tegretol prescription, however, was renewed until November 16, 2021.

Carter remained on Baclofen, Indomethacin, and Tegretol until April 28, 2022. In the interim, he had medical visits on October 29, 2021, December 29, 2021, and February 16, 2022. At the December 29, 2021 visit, Dr. Hunter ordered x-rays on Carter's forearm and ankle and renewed his pain medication prescriptions. At the February 16, 2022 visit, when Carter requested Neurontin, Dr. Hunter requested a review from the pain management committee on whether it should be reinstated. She also reordered the x-rays, but the medical records reflect that he refused the x-rays on February 21, 2022.

During a May 4, 2022 visit with Dr. Hunter, Carter requested an x-ray of his left forearm and right ankle. At that time, Carter's Tegretol prescription was scheduled to run through August 20, 2022, and Dr. Hunter continued the prescriptions for Baclofen and Indomethacin through August 31, 2022. According to Dr. Hunter, she had no further involvement with Carter's care after the May 4, 2022 visit.

IV.     **Second Treatment at RCI**

On July 12, 2022, Carter was transferred from MCIH back to RCI. On August 21, 2022, Carter was seen by a registered nurse, Joseph Brenyah, for a sick call request to adjust his pain medication. At that time, Carter had a normal range of motion in his wrist and right ankle. The nurse referred Carter to a medical provider. On August 31, 2022, his Baclofen and Indomethacin prescriptions were refilled through the end of 2022. After he complained in October 2022 that his Tegretol prescription had not been continued past August 2022, it was renewed on October 25, 2022. On January 18, 2023, Carter was seen by Dr. Choudry for chronic care, and his prescriptions for Indomethacin, Baclofen, and Tegretol were renewed until May 17, 2023.

On or about March 10, 2023, a pain management committee reviewed Carter's history, medications, and medical records and determined that Carter's pain medication regimen should change in that his use of Baclofen would be tapered down, Cymbalta would be prescribed, and Capsaicin cream would be prescribed for application to help reduce neuropathic pain. The panel also agreed that follow-up x-rays of Carter's left forearm and right ankle would be ordered. All of the changes made were discussed with Carter, who reluctantly agreed to discontinue Baclofen.

On April 19, 2023, Carter was seen by physician's assistant Crystal Jamison for chronic care. Carter expressed frustration with the discontinuation of Baclofen and complained that Cymbalta caused gastrointestinal problems and blurred vision. Although Carter also reported

multiple joint pain, he acknowledged that he was an avid weightlifter and that he worked out on a daily basis. He also stated that he hurt his shoulder while lifting weights six months earlier and requested an MRI. Jamison advised Carter that weightlifting while on muscle relaxers is dangerous, but Carter insisted that he would not stop lifting weights. Jamison renewed Carter's prescriptions for Indomethacin, Tegretol, Lidocaine topical cream, Capsaicin cream, and Cymbalta.

On May 10, 2023, Carter had x-rays on his left ankle, left forearm, and left shoulder. The x-rays showed no evidence of an acute fracture and no evidence of problems with the hardware in his wrist and ankle.

On or about June 14, 2023, the Regional Medical Director reviewed Carter's case and concluded that Lyrica should be prescribed to treat Carter's chronic pain and that Tegretol should be tapered off. Carter was agreeable to the plan. He continued to receive Lidocaine and Capsaicin cream as well as Indomethacin, but Cymbalta was not renewed.

In his brief opposing the Motions, Carter asserts that despite the prescriptions provided throughout this time period, his medication is "always missing from the cart" when they are delivered to his housing unit tier. Opp'n at 2, ECF No. 23.

### V.     Dr. Hunter

Dr. Hunter, a physician who worked at MCIH from June 3, 2019 to July 1, 2022, has provided a declaration in which she addressed the care provided to Carter. As to the medications prescribed to Carter, Dr. Hunter asserts that each can be an appropriate medication to treat chronic pain, but some come with risks. According to Dr. Hunter, Tegretol and Neurontin are anticonvulsant medications used to treat seizures as well as nerve pain. Neurontin, however, "has a euphoric and dissociative effect and therefore it is very sought after as a drug of abuse in jails

and prisons." Hunter Decl. ¶ 5, ECF No. 15-2.  Because of these effects, Neurontin is "carefully controlled in the prison setting and only prescribed when absolutely necessary." *Id*.  Dr. Hunter also states that Lyrica is an anticonvulsant which was originally used to treat epilepsy but is now used to treat certain kinds of pain.  Like Neurontin, it can also be abused and is therefore carefully controlled in the prison setting.

She states that neuropathic pain can be addressed through the use of anti-depressants, such as Cymbalta, given in doses lower than what is prescribed for depression.  While Cymbalta is generally considered non-addictive, abuse and dependency can occur due to its calming and mood-boosting effects.  Elavil, another anti-depressant, is also often used to treat neuropathic pain and is "recommended as a first line treatment in many guidelines." *Id.* ¶ 6.

As for Baclofen, Dr. Hunter asserts that it is a muscle relaxer that has "become a drug of abuse in prisons because it can be used in excess or mixed with other substances to produce a feeling of euphoria." *Id.* ¶ 7.  Finally, Dr. Hunter states that Oxycodone, as a narcotic, is not appropriate for the treatment of chronic pain due to the high risk of addiction and abuse.

Overall, Dr. Hunter asserts that Carter's medical needs were not ignored and states, as a medical opinion, that Carter received appropriate pain medications for his complaints of chronic pain.

## DISCUSSION

In her Motion, Dr. Hunter seeks dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56 on the grounds that Carter has not sufficiently alleged or established that she or any other medical provider acted with deliberate indifference to his medical needs in violation of the Eighth Amendment.  In their Motion, the State Defendants argue that they

are entitled to dismissal or summary judgment because they are entitled to Eleventh Amendment immunity and because Warden Bivens had no personal involvement in Carter's medical care.

I. **Legal Standards**

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

When deciding a motion to dismiss under Rule 12(b)(6), the Court generally considers only the complaint and any attached documents. *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts must treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Here, both Motions seek dismissal or, in the alternative, summary judgment and attach exhibits. The notice requirement has been satisfied by the titles of the Motions. To show that a reasonable opportunity for discovery has not been provided, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). In opposing the Motions, Carter has attached his own exhibits and has not argued that discovery is required. The Court will construe the Motions as motions for summary judgment for purposes of the arguments requiring consideration of the submitted exhibits.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.*

## II.    Dr. Hunter

In her Motion, Dr. Hunter argues that neither she nor any of the other medical providers involved in Carter's care failed to provide adequate medical care for his chronic pain in violation

of the Eighth Amendment, which protects prisoners from "cruel and unusual punishment" and prohibits "unnecessary and wanton infliction of pain" against inmates. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). In order to state an Eighth Amendment claim for inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106. Such deliberate indifference requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* "Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto*, 841 F.3d at 225 (internal alterations omitted). Under this standard, a mere

disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

A review of Carter's allegations and the record evidence establishes that Carter has not provided a sufficient basis to support his deliberate indifference claim. Carter's medical records establish that during the relevant time period, the medical providers, including Dr. Hunter, regularly conducted medical visits with Carter and provided pain medication to address Carter's chronic pain arising from his 2004 wrist and ankle injuries. Although certain medications were discontinued, generally because of medical concerns relating to risks of abuse in a prison setting, Dr. Hunter and the other medical providers prescribed alternative pain medications in their place. Moreover, while Carter disagreed with the specific medications provided, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Jackson*, 775 F.3d at 178 (finding that a disagreement "between an inmate and a physician over the inmate's proper medical care" typically falls short of deliberate indifference). Even if the medications did not always address Carter's pain satisfactorily, the regular medical appointments and ongoing adjustments of the types of medications prescribed preclude a finding that Dr. Hunter or other medical providers acted with deliberate indifference to Carter's medical needs.

As for Carter's allegation in his brief that his medications were not always on the cart when they were brought to his housing unit, that claim, even if true, amounts only to negligence, not

deliberate indifference. *See Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) (stating that "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it"). Although Carter has also alleged a significant delay between his request for x-rays on his wrist and ankle and the actual conduct of the x-rays, the medical records reflect that Dr. Hunter ordered them in December 2021 and February 2022, but Carter declined to undergo the x-rays on February 21, 2022. Even to the extent that there may be a factual dispute over whether he refused the x-rays, where the x-rays later taken in 2023 revealed no abnormal results, he has not provided sufficient evidence to show that the failure to take x-rays earlier constituted deliberate indifference to a serious medical need.

Finally, the record reflects that Dr. Hunter's involvement with Carter's medical care was limited to certain medical visits at MCIH between January 2020 and August 2022, during which she consistently prescribed or continued certain pain medications. She had no role in the medical care before or after those dates, she actually ordered x-rays on multiple occasions, and she had no role in the actual placement of medications on the medical cart. Particularly when the Court focuses on Dr. Hunter's personal role in Carter's medical care, it finds that there is insufficient evidence to establish that she acted with deliberate indifference to his medical needs. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (stating that liability under § 1983 requires personal involvement and cannot be based on vicarious liability). For all of these reasons, the Court will grant Dr. Hunter's Motion.

### III.   State Defendants

The State Defendants first argue that the claims against the State of Maryland, Department of Corrections ("the DOC"), as well as any claims against Warden Bivens in his official capacity, are barred by Eleventh Amendment immunity. Suits against state officials or employees in their

official capacities are suits against the State itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Under the Eleventh Amendment to the Constitution, absent consent, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12–201(a) (LexisNexis 2021), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Accordingly, the claims against the DOC, a State agency, and any claims against Warden Bivens in his official capacity will be dismissed under the Eleventh Amendment.

As for any claims against Warden Bivens in his personal capacity, such claims fail because there is no allegation that Warden Bivens interfered with the medical care provided to Carter, nor is there any evidence that he prevented Carter from receiving care. Generally, vicarious liability is not available on a § 1983 claim, so to adequately state a constitutional claim under § 1983, a plaintiff must provide allegations of personal participation by the defendant. *See Love-Lane*, 355 F.3d at 782. Liability of a supervisory official "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable

13

risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor's response to the knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (quoting *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)).

Here, there is no evidence that Warden Bivens had any role or direct responsibility relating to Carter's medical care. Although Carter has submitted several ARPs, most post-dating the time period addressed by the Amended Complaint, in which Warden Bivens was notified of some of his complaints about inadequate medical care, Warden Bivens actually found on more than one occasion in 2023 that there had been an undue delay in providing medical care and then notified the medical providers that they needed to address it. As for the specific medical care and pain medications provided, Warden Bivens has provided an undisputed declaration stating that he has no authority to order or recommend any particular medical treatment, which is overseen by a company under contract to provide medical care. Correctional personnel typically are not liable for deliberate indifference when they allow the medical staff to make decisions about medical care. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (noting that a warden was entitled to rely upon the health care providers' expertise); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (stating that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands"); *Shelton v. Angelone*, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("Prison personnel may rely on opinion of the medical staff as to the proper course of treatment."). Where neither the allegations nor the evidence support

the conclusion that Warden Bivens is liable based on deliberate indifference to Carter's medical needs, the Court will grant the State Defendants' Motion.

## IV. Motions to Amend

After the filing of Dr. Hunter's Motion, Carter filed two Motions to Amend the Caption and also seeks through his brief to add a claim of deliberate indifference arising from a failure to treat properly an injury to his shoulder. In one of the Motions to Amend, ECF No. 24, Carter merely seeks to correct the first name of Warden Bivens, a change which the State Defendants have also requested. That Motion will be granted.

In his other Motion to Amend, Carter seeks to add Corizon Health, Inc. ("Corizon") as a defendant because it is the contractor medical care provider for RCI and MCIH. Although a party may amend its pleading once as a matter of course within 21 days after serving it, or within 21 days after service of a Rule 12 motion, whichever is earlier, Fed. R. Civ. P. 15(a)(1), Carter's Motion to Amend was not filed within this timeframe. Carter therefore requires leave of the Court or the consent of the opposing party in order to amend the complaint. Fed. R. Civ. P. 15(a)(2). Although "[t]he court should freely give leave when justice so requires," *id.*, a "district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)). "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Id.*

Here, Carter's proposed amendment does not assert any specific allegations against Corizon. Significantly, for an entity such as Corizon to be held liable for an Eighth Amendment violation, the plaintiff must establish that it had a custom or policy that causes a violation of the

15

Constitution or laws of the United States, such as a policy of deliberate indifference to serious medical needs. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *see also Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978). Here, the Amended Complaint does not allege, and does not provide sufficient facts to show, that Corizon has such a custom or policy. Upon review of the record now available, there is no basis to conclude that Corizon had such a custom or policy, or that Carter's Eighth Amendment rights were violated as a result of such a custom or policy. Accordingly, the Court finds that any amendment to add Corizon as a defendant would be futile and will therefore deny that Motion to Amend.

Finally, in his memorandum in opposition to the Motions, Carter complains that he still has not seen a doctor to address an injury to his shoulder and rotator cuff, and that he has not received an MRI on his shoulder. Because the Complaint and Amended Complaint related only to alleged failure to treat chronic pain arising from his 2004 wrist and ankle injuries, Carter's references to allegedly inadequate medical care for this shoulder injury are outside the scope of the pleadings and constitute an impermissible attempt to amend the complaint through a brief in opposition to a Motion. *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 436 (D. Md. 2006) (holding that a plaintiff may not amend the complaint through argument in a brief opposing summary judgment). Where the claims actually asserted in the Amended Complaint have now been resolved, to the extent that Carter would like to assert a claim regarding the care for his shoulder injury, he must file a separate complaint in a new case.

## CONCLUSION

For the foregoing reasons, Dr. Hunter's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 15, will be GRANTED, and the State Defendants' Motion to

Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 21, will be GRANTED. The Motion to Amend relating to Corizon, ECF No. 20, will be DENIED, and the Motion to Amend relating to Warden Bivens, ECF No. 24, will be GRANTED. A separate Order shall issue.

Date:   May 24, 2024

THEODORE D. CHUANG
United States District Judge